UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Youa Vang Lee, trustee for the heirs
and next-of-kin of Fong Lee,
Decedent,

Civil File No.  07-CV-1205 PAM/JSM

Plaintiff,

v.

**PLAINTIFF'S
TRIAL BRIEF**

Officer Jason Andersen and
The City of Minneapolis,

Defendants.

---

INTRODUCTION

This is the tragic and egregious case of the wrongful death of a 19 year-old Hmong man named Fong Lee.  Mr. Lee was shot eight times in broad daylight by Defendant rookie police officer Jason Andersen when, by all witness accounts (including a ***videotape*** capturing the incident), no threat of serious bodily injury or death ever existed.  In fact, the evidence will establish Fong Lee did not have a gun at the time he was killed.

This is also a case where the defendants engaged in outrageous behavior, including making false allegations to justify the homicide and, tried to cover-up the same through lack of any reasonable investigation, allegedly planting a gun next to Fong Lee's body, and ratifying and condoning the unjustified and unconstitutional shooting.

STATEMENT OF FACTS

The facts and evidence will establish the following:

Fong Lee was born on March 5, 1987, and was shot to death by Defendant Andersen on July 22, 2006. Fong is survived by his mother (trustee herein), his father, and five brothers and one sister. Fong was a very devoted son, brother and friend. He is greatly missed by his family, friends and the Hmong community.

The evidence will establish that in the afternoon of July 22, 2006, Fong Lee got together with his friends Nhia Lor, Phong Xiong, Bobby Vang and Too Xiong. It was a beautiful and sunny summer day, and these young men (all Hmong) decided to take a bicycle ride around their neighborhood. Depo. N. Lor, pg 15, lines 11-14, pg 34, line 10; Depo. P. Xiong, pg 16, line 25, p 18, lines 8 and 21, pg 44, line 7; Depo. B. Vang, pg 14, line 24, pg 18, lines 4-13; Depo. T. Xiong, pg 14, lines 10-11.

The young men, while riding their bikes, eventually decided to ride to the Cityview Elementary School located at 3350 North Fourth Street in Minneapolis, Minnesota. As these young men were riding their bicycles north on Third Street, which leads into the school parking lot, they were observed by a couple of the neighbors who were outside barbequing.

Vajying Vue, who works for Medtronic and had been barbequing at home adjacent to the school, will testify that he saw Fong Lee and his friends just riding their pedal bikes towards the school. Depo. V. Vue, pg 14, lines 20-21. Mr. Vue did not know these young men. Id, pg 23. Mr. Vue observed the young men just socializing as they were pedaling their bikes. Id, pg 34, lines 1-3. Mr. Vue did not see anything threatening or suspicious. Id, pg 32, line 13. Mr. Vue will testify that Fong and his friends "*looked pretty normal to me, just like a bunch of guys going to play basketball, nothing suspicious. . .*" Id, pg 32, lines 13-15.

Independent witness Ger Vang, who was also outside and by the school, will testify that he saw Fong Lee (the kids) on their pedal bikes heading towards the school. Depo. G. Vang, pg 14, lines 15-20. This witness will testify that the young men, including Fong Lee, were "just riding bikes." Depo. G. Vang, pg 14, line 23. This witness will further testify that he did not see any suspicious activity with the young men, did not observe any drug dealing activity or anything else that appeared amiss. Depo. G. Vang, pg 32, line 13.

A third independent witness, Pang Vang, then living at 3219 Third Street North (adjacent to the school) will testify that she also saw the young men approaching the school. She will testify that she did not see any inappropriate behavior or anything that appeared suspicious or out-of-line. Depo. P. Vang, pg 22, line 21. It should be noted that these witnesses did not know Fong Lee or any of his friends. Depo. P. Vang, pg 23, lines 13, 18.

The evidence will establish that as Fong Lee and his friends were riding their bikes up to the school, Defendant Officer Jason Andersen was in the immediate area with his passenger and partner, Trooper Craig Benz. According to both Defendant Andersen and Trooper Craig Benz, no one had radioed for help and they were not dispatched to the Cityview Elementary School area. Depo. C. Benz, pg 72, line 4; Depo. J. Andersen, pgs 33-34, lines 24-2. According to Trooper Benz, he and Officer Andersen just happened to be patrolling the area. Depo. C. Benz, pg 72, line 7.

The evidence will establish that as they were in the vicinity of the school, Officer Andersen saw the young Hmong males and decided to drive up to them for no other reason than just to see what happens. Depo. J. Andersen, pg 38, lines 9-10. As Andersen testified in his deposition: ***"we're just going to drive behind these guys and see what happens."*** Id, pg 38,

lines 9-10. (Emphasis added). Plaintiff anticipates Andersen will testify the same way in trial, supporting the legal conclusion that Officer Andersen had no Fourth Amendment articulable suspicion to approach and move-in for stopping Fong Lee and his friends.

The facts and evidence will establish that the squad car drove quickly up to and behind the bicyclists as they were going into the parking lot of the Cityview Elementary School. Many of the independent eyewitnesses, including Mr. Vue, will testify that they saw the squad car quickly speed up towards Fong Lee and his friends. Depo. V. Vue, pg 15, lines 17-25.

Even though Officer Andersen and Trooper Craig Benz testified in deposition that they were familiar with Fourth Amendment articuable suspicion standards for approaches and stops, neither Defendant Andersen nor Craig Benz could articulate any objective suspicion (reason) for catching up to and driving right behind the Hmong men. Depo. Benz , pg 90, line 5. Plaintiff anticipates this is what the officers will testify to, as well, in trial.

Craig Benz testified in deposition that as he was approaching the young men, he did not recall seeing any one or anything appearing suspicious. Depo. C. Benz, pg 74. Likewise, the trooper did not hear anything that was suspicious, did not hear any gun shots, did not see any illegal activity going on, did not see any drug dealing activity, did not see or hear any of the Hmong men say anything to him or his partner, and saw nothing that would raise criminal suspicion as he was approaching the school and the young men. Id, pg 76, 90, 91. The trooper did not even see any of the young men spit. Id, pg 91.

Trooper Benz is expected to testify (as he did in deposition) that he did not see any of the young men carrying any objects in their hands, did not see any large objects on them, did not observe any gestures or obscene language, did not observe the young men trying to damage

property, and to the trooper's knowledge, the young men were not trespassing on school property. There were no signs posted warning against trespassing or bicycle riding. Depo. C. Benz, pgs 82-84.

Officer Andersen testified in deposition that as he saw the young Hmong men riding their bikes towards the school, none of them turned around and made any threatening gestures, swore or tried to race towards the squad. In fact, all Andersen saw was the young Hmong men pedaling their bicycles towards the school. Depo. J. Andersen, pgs 37 and 38. Plaintiff anticipates Officer Andersen will keep his testimony consistent at trial.

The evidence and testimony will establish the squad car overtook the speed of the bicyclists and ended up hitting the back of Fong Lee's bicycle, causing Fong Lee to fall off his bike. Independent witness, V. Vue, is expected to testify, as he did in deposition, that he saw Officer Andersen's squad car "really speed up enough to hit" Fong Lee's bike and knock it over. Depo. V. Vue, pg 16, lines 19-20; Mr. Vue will further testify that he saw Fong fly off of his bike when it was hit. Id pg 17, line 11; Depo. N. Lor, pg 20, lines 13-16 (saw Fong get run over. . .we did not do anything).

Independent witness Phong Xiong will testify that from his vantage point, it looked like the squad was <u>intentionally</u> trying to run Fong Lee over. Depo. P. Xiong, pg 21, lines 21-22 (emphasis added), Depo. B. Vang, pg 23, lines 1-4; Depo. T. Xiong, pg 16, line 25 (the squad was going pretty fast when he hit Fong Lee).

The evidence will establish that after Fong Lee was knocked off his bike, he got up and began to run away. He was scared after what just occurred. The evidence will further establish both Defendant Andersen and Trooper Benz exited their squad car and gave foot pursuit. Depo.

C. Benz, pg 104-106; Depo. J. Andersen, pg 47-48. The evidence will show Defendant Andersen chased Fong around the school and ended up shooting at Fong Lee on three separate occasions during the chase, and pumped a total of eight bullets into his body. Depo. J. Andersen, pg 56, line 23.

The justification given by Defendant Andersen for the killing was that he claims he eventually saw Fong Lee holding a gun in his right hand while on his bike, and while running away from the officer and trooper. Andersen has also testified in deposition that Fong Lee threatened him with the gun. Depo. J. Andersen, pgs 41-60. Trooper Benz, however, is expected to testify that while he may have seen a gun in Fong Lee's hand at the early stages of the stop and pursuit, he (Trooper Benz) **never** saw Fong Lee point the gun at anyone, and never saw Fong Lee make any menacing gestures with the alleged gun at any time. Depo. Benz, pgs 106-115. (Emphasis added).

What the jury will likely find troublesome is the fact that Defendant Andersen is expected to testify (as he so did in deposition) that he could not recall how the gun was being held, the type of gun Fong Lee was allegedly holding, and whether Fong Lee's finger was ever on the trigger of this alleged gun. Depo. J. Andersen, pgs 46-51. Officer Andersen is expected to admit in trial, as he did in deposition, that the alleged gun possessed by Fong Lee was never fired, and **never directly pointed at the officer or anyone else** at any time during this entire ordeal. Id, pg 44, line 17; pg 51, line 22; pg 55, line 17; pg 57, lines 22-24. (Emphasis added).

It is expected that Trooper Benz will testify, as he did in deposition, that he never saw Fong Lee threaten Officer Andersen, himself, or anyone else with the alleged gun, and claims he

did not see the shooting incident (even though he was physically present at the scene by Andersen). The school video confirms this.

Trooper Benz is expected to testify, as he did in deposition, that he (Trooper Benz) does not know to any extent what Fong Lee was doing when he as shot eight times and killed by Defendant Andersen. Depo. Benz, pgs 106 - 115. The trooper is expected to testify, as he has done in deposition, that he <u>never</u> saw Fong Lee point the alleged gun at anyone, or make any menacing gestures with it. <u>Id,</u> pg 106.(Emphasis added). In fact, Trooper Benz is expected to testify that he only saw the alleged gun for a short time at the initial approach, and never saw the gun again. Both officers will testify the school area was deserted at the time and there were no bystanders in the area.

The facts and evidence will establish that, unbeknownst to Defendant Andersen and Trooper Benz, this incident (killing of Fong Lee) was captured on video tape by a camera owned, operated and mounted on the City View Elementary School. Through discovery, plaintiff's counsel has obtained the footage, and had an independent expert review the film.

Mr. Richard Diercks, president of Forensic Video, will testify in trial that Fong Lee did **not** have a gun or any object in his right hand while he was running away from the police, as they have claimed. Supplied herewith as Exhibits 1 and 2 are still photographs from the video in question, and Mr. Diercks' expert report where he unequivocally states Fong Lee had absolutely nothing in his right hand at the time he was running from, shot and killed by Officer Andersen.

The jury is expected to find that the expert analysis of the video tape is 100% consistent with all eyewitness accounts (Fong Lee's friends and those individuals in the neighborhood), in that Fong Lee did not possess a gun at the time he was running from the police officers and being

shot at; and, did nothing threatening or menacing to Officer Andersen. Depo. V. Vue, pgs 34-35; Depo. N. Lor, pg 32, lines 5-7; Depo. G. Vang, pg 27, lines 10-11, pg 31, lines 21, 25; Depo. P. Xiong, pg 19, lines 2, 4; Depo. P. Vang, pg 21, lines 14, 18; Depo. B. Vang, pg 20, line 25; Depo. T. Xiong, pg 25. See video to be played at trial.

In fact, the eyewitnesses will testify that they never saw any weapon or guns before the shooting. Id. None of the eyewitnesses, including Defendant Andersen's partner, Trooper Benz, saw Fong Lee take any menacing stance or position against Defendant Andersen. Id, Depo. Benz, pgs 106, 111. Even Defendant Andersen admits Fong Lee never directly pointed his alleged gun at him at any time. Depo. J. Andersen, pgs 44, 51, 57.

The evidence will establish that a second gun allegedly recovered three feet from Fong Lee's *left*[1] hand by the crime scene investigators some time after the shooting, was actually a planted or dropped gun. The City's own experts will testify that the gun recovered was devoid of any trace evidence. The City will admit, as they have done so in discovery and in Responses to Requests for Admissions, there were was no identifiable finger prints, palm prints, oils, DNA, fibers, splatters of blood, or any other trace evidence on or around the gun. See Responses to Admissions, Exhibit 3, supplied herewith and incorporated herein by reference. It is expected that the defendant's own expert, Officer R. Timmerman will corroborant these allegations in trial. R. Timmerman, pg 20.

The evidence and testimony will establish that Fong Lee was covered with blood, from head to toe. Both of his hands were bloody from the bullet wounds. Yet, the evidence will establish not one speck of blood was found on the gun. A jury will likely find this implausible.

---

[1] Defendants are adamant that Fong Lee was holding the alleged gun in his right hand.

Officer Andersen is expected to testify in trial, as he did in under oath testimony in his deposition, that he shot Fong Lee five times while Fong Lee was on his back, gripping the alleged gun in his right hand and raising it up slowly, to some extent off the ground by his right hip. Yet, the evidence will show the gun was actually found approximately three feet or further from Fong Lee's outstretched <u>left</u> hand. Plaintiff respectfully submits that a jury will not find the resting place of the gun to be logical or even plausible.

In fact, plaintiff submits that expert witnesses, including the medical examiner, Dr. Jon Thompson, will testify that it is inconceivable how the gun ended up without any blood on it, next to Fong Lee's outstretched left arm, when Officer Andersen testified that he pumped five rounds into Fong Lee's body (including a kill shot to the heart) when Fong Lee was gripping the gun in his right hand as he was laying on the ground. No reasonable jury could reconcile the officer's testimony with where the completely clean gun ended up.

In that regard, the medical examiner is expected to testify that it is implausible not to find any blood splatter on the gun if, as Officer Andersen testified, Fong Lee was holding the gun in his right hand at the time of his death. Fong Lee's body was covered with blood, as was his right and left hands.

It is also anticipated that the medical examiner will testify that the gun shot entrance wound to Fong Lee's hand was likely the result of a defensive move of Fong Lee, (i.e., putting his hand up as if to say please don't shoot me).

The evidence and witnesses to be called will establish that the alleged gun found next to Fong Lee's body was actually a gun the police department had recovered and kept in their possession and control since February of 2004. Various police reports and testimony generated

by Officer Tony Adams, Mike Fossum, and the actual owner of the gun, Dang Her, will all corroborate this allegation.

For the court's reference, supplied herewith as Exhibit 4 is the 2004 police report which shows the police had the unique .380 Russian made Baikal gun recovered from a burglary earlier that month (February of 2004), and contacted the owner, Dang Her, about the same.

Additional video evidence will be presented by plaintiff. Officer Andersen's squad car was equipped with a video camera. According to the City's own experts, the camera is automatically turned on when the lights and/or siren are activated on the squad car. The evidence and testimony will establish that the police officers do not have the ability to override this automatic switch-on process.

The evidence will establish that even though both Police Officer Andersen and Trooper Benz (as they testified in deposition) turned the lights and/or siren of the squad car while the squad was still moving towards and chasing Fong Lee on his bike, the squad video produced in discovery captures no motion of the squad car and is devoid of any audio or visual depictions of the two police officers. Plaintiff respectfully submits that a reasonable jury will find this to be incredible.

What the evidence will also establish is the fact that the squad car video was not actually obtained, secured and impounded for review by the police department until approximately <u>ten days after the shooting</u>. When the jury views the squad car video, they will see Officer Andersen's squad car in operation for several days before the Fong Lee incident. During those segments, the jury will see (captured on video) the movement of the squad car, the lights and sirens on, and an accounting of the police officer.

However, when it comes time for the Fong Lee incident, the video tape literally will go blank for a second or two, and when it comes back on, all the jury will see is the squad car sitting parked in front of the City View Elementary School with its lights and siren on. There is no depiction of any motion of the squad car, and there is no accounting (either audibly or visually) of either Officer Andersen or Trooper Benz.

Plaintiff submits that there is strong evidence to support a claim of spoilation of evidence. In that regard, and as will be discussed in this brief below, plaintiff is requesting jury instructions on the issue of spoilation of evidence and what a jury can infer therefrom. Plaintiff's counsel very respectfully directs the court to <u>Dillon v. Nissan Motors,</u>, 986 F.2d 263 (8th Cir. 1993); Judge Donald Alsop's decision in <u>Backlund v. City of Duluth, et al</u> (File No. 5-95-137, 1998) (opinion attached and incorporated herein); see also <u>Wajda v. Kingsbury</u>, 652 N.W.2d 856 (Minn. Ct. App. 2002) (when evidence critical to a party's claim is under the exclusive control of an adverse party and the evidence is destroyed, whether accidentally or otherwise, the court has discretion to permit the jury to make an unfavorable inference from that fact).

The facts and evidence will establish the City did anything but a reasonable investigation into this high profile killing. The City of Minneapolis never interviewed any of the young men who were with Fong Lee at the time of the shooting. The young men in question were only deposed after plaintiff commenced this civil cause of action, long, long after Officer Andersen was cleared of any wrongdoing by the Chief of Police.

The facts and evidence will establish that none of the eyewitnesses deposed in the civil case (neighbors living in the area of the shooting) were ever formally interviewed by the police. No statements were ever obtained.

The facts and evidence will establish that the City of Minneapolis never reviewed the squad video before Officer Andersen was cleared (two days after the shooting) and put back to work. The facts and evidence will establish the City never analyzed the video tape from the City View Elementary School - which absolutely shows Fong Lee had no gun in his right hand during the foot chase and at the time Officer Andersen killed him.

The facts and evidence will establish that the police department intentionally ignored a favorable witness, Ms. Muriel Schauer, and others who told the police at the scene that they saw no foul play on Fong Lee's part, and never heard Officer Andersen shout something to the effect of "drop the gun, drop the gun." Ms. Schauer will so testify.

The facts and evidence will establish that the City never interviewed any of the witnesses who saw the squad car strike the back end of Fong Lee's bike, throwing him off the same. Chief Dolan is expected to testify at trial that he made representations that there would be a thorough investigation into the Fong Lee shooting and all potential witnesses would be interviewed and investigated. Clearly, this did not even come close to happening.

The facts and evidence will establish that the City of Minneapolis was warned of some concerns a psychologist had with Officer Andersen before Andersen was hired to Minneapolis Police Department.

Finally, Plaintiff's expert, Phillip Corrigan, will testify the shooting and killing of Fong Lee was not reasonable under the circumstances.

**LEGAL ISSUES**

1. <u>Standard for 42 U.S.C. §1983</u>

As the Court undoubtedly knows, the U.S. Constitution, State Constitution and

U.S. Supreme Court cases, along with the City of Minneapolis' own policies, guidelines and state statutes provide that deadly force can only be used when an officer objectively finds himself in fear of imminent serious bodily harm or death. It is absolutely well settled law that a police officer cannot shot a fleeing felon who is simply possessing a gun. Here, Fong Lee had no gun.

The shooting would only be constitutionally permissible if the police officer had an objective basis to believe the felon posed an immediate threat of great physical harm or death to the officer or others.

In accordance with <u>Tennessee v. Gardner</u>, the city's policy, which is also taken from Minnesota Statute §609.66, provides that deadly force should be only be used:

1. To protect a peace officer or another from apparent death or great bodily harm;

2. To effect the arrest or capture or to prevent the escape of a person who the peace officer knows or has reasonable grounds to believe has committed or attempted to commit a felony involving the threatened use of deadly force; or

3. To effect the arrest, capture or prevent the escape of a person the officer knows has committed or attempted to commit a felony if the officer reasonably believes that the person will cause death or great bodily harm if the person's apprehension is delayed. <u>Id</u>.

The use of force policy with the City of Minneapolis specifically highlights the holding in <u>Tennessee v. Gardner</u> and specifically instructs officers, "***<u>A fleeing felon shall not be presumed to pose an immediate threat to life.</u>***"

In the instant case, plaintiff has retained expert police officer Philip Corrigan who will testify Officer Andersen used excessive force. In fact, other than Officer Andersen himself, the

City has produced no witness to argue Fong Lee posed a threat of great bodily harm or death to any of the officers or anyone else for that matter. Indeed, even Andersen's then partner, Trooper Craig Benz, testified under oath that he did not see Fong Lee point the alleged gun at anyone and saw no menacing behavior or threats Fong Lee made. Officer Andersen testified the school area was empty at the time of the shooting (i.e., no threat to bystanders). Finally, again, since Fong Lee had NO gun in his hand when he was chased and killed, no reasonable jury should find the shooting to be constitutionally permissible. Plaintiff also directs the court, respectfully, to the standard jury instructions for the 8th Circuit.

  2. <u>Wrongful Death under Minn. Stat. § 573.02</u>

Minnesota Statute Section 573.02 provides that "when death is caused by the wrongful act or admission of any person or corporation, the trustee appointed. . . may maintain an action (for wrongful death)." The statute goes on to provide that "an action to recover damages for a death caused by an intentional act constituting murder may be commenced at any time after the death of the decedent. . ." <u>Id</u>.

In the instant case at bar, plaintiff has asserted state claims under Minnesota's wrongful death statute against Officer Andersen and the City of Minneapolis (vicarious liability/respondeat superior). As the Court will note, the City has <u>never</u> moved for summary judgment on the State Court claims and has never moved for judgement based on official or qualified immunity.

In the instant case at bar, plaintiff should be able to present the elements for wrongful death and vicarious liability to the jury, as the evidence certainly supports such allegations, as pled.

The evidence will establish that Officer Andersen was working in the course and scope of

his employment and in his official capacity, and under color of state law at the time Fong Lee was killed. The evidence will also support a finding that Officer Andersen acted maliciously by shooting Fong Lee five times when he was on the ground, and, as a matter of fact, had no gun in his hand. There is sufficient factual evidence for a jury to hold Officer Andersen accountable for intentional murder/wrongful death.

While the Eighth Circuit certainly takes a dim view on vicarious liability for 1983 claims, vicarious liability is viable under the Minnesota State Statute. The City can and should be found liable under respondeat superior for Officer Andersen's intentional and malicious conduct. Minnesota Statute Section 466.02 provides that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function."

3.  Spoilage of Evidence

In the instant case at bar, there is a sufficient factual basis to show the City tampered with, disposed of, and otherwise negligently failed to keep critical evidence (i.e., the squad car video from Officer Andersen's squad).

As such, plaintiff is requesting the sanction of a jury instruction similar to those given in the case of Backlund v. City of Duluth, et al, Civ. File No. 5-95-137 (D Minn 1998) (copy of opinion supplied herewith and incorporated herein by reference - Judge Alsop); and, Wajda v. Kingsbury, 652 N.W.2d 856 (Minn. Ct. App. 2002).

In Backlund, supra, the plaintiff sued the City of Duluth for job discrimination. In essence, Backlund sued over nepotism which he alleged prevented him from getting a job. During the discovery process it was learned that the City had allegedly destroyed certain

documents pertaining to the hiring process and/or misplaced documents and records from hearings.

As a result thereof, plaintiff asked the court to impose a rebuttable evidentiary presumption that the lost or destroyed information was favorable to his case. The court agreed stating, "A rebuttable evidentiary presumption is an appropriate remedy" for the destruction or loss of evidence. The court held, "it will grant plaintiff the rebuttable evidentiary presumption that the interview documents or data destroyed would have been favorable to his case." See Order attached herewith and incorporated herein by reference.

In Wajda, supra, which is analogous to the Fong Lee matter, a law suit arose out of a collision between a police squad car and a tow truck. The issue at trial was whether the squad car's siren had been activated. Like in the Fong Lee case, a tape was not kept or preserved.

In that particular trial, the district court instructed the jury that,

> Testimony has been introduced indicating that a police dispatch tape recording existed which may have shown whether a siren was activated and, if so, when it would have been activated. . . the tape recording was in the possession and control of the City of Minneapolis. . . the tape recording no longer exists. . . you are permitted (but not required) to infer from this fact that the, "siren evidence" is favorable to the plaintiff. Weigh this along with all other "siren testimony in this case."

On appeal, the court stated the trial court has broad authority in determining what, if any, sanction is to be imposed for spoilation of evidence. Id. Citing to Patton v. Newmar Corp., 538 N.W.2d 116 (Minn. 1995).

The court recognized in Wajda that a "central part" of the case was the issue of whether the squad car's siren was activated during a particular time. As such, the court found the tape

which should have been in existence was "critical" and the Court of Appeals affirmed the District Court's sanction of the favorable jury instruction to the plaintiff.

Furthermore, as the court in Wajda explained, "The law in Minnesota is that the spoilation of evidence need not be intentional to warrant sanctions." Id, Citing to Patton. supra, 538 N.W.2d at 119; Himes v. Woodings- Veroni Tool, 565 N.W.2d 469 (Minn. Ct. App. 1997) (concluding that imposition of sanctions was not an abuse of discretion where evidence was destroyed through inadvertence or negligence).

In Dillon v. Nissan Motor Company, 986 Fed. 2nd 263 (8th Cir. 1993), the court recognized and held that, "The destruction of evidence that a party knew or should have known was relevant to imminent litigation certainly justifies the sanction under the court's inherent powers."

In the instant case at bar, there is more than a sufficient factual basis to allow the sanction of the rebuttable evidentiary presumption instruction plaintiff is now requesting.

It is uncontroverted that Officer Andersen's squad car was equipped with a squad video. It is also uncontroverted that Officer Andersen and Trooper Benz testified that they activated the video camera (by activating the lights and/or siren) when the initial attempted stop of Fong Lee began.

It is uncontroverted that the defendant police officer and Trooper Benz testified that the lights and siren were put on (i.e., thus activating the camera) at the early junction of the attempted stop and chase, and that the squad car drove over a curb, continued to follow Fong Lee and his friends while they were on bikes, and eventually drove and stopped the squad car by the school to begin a foot pursuit.

It is also uncontroverted that the video produced by the city shows several days of the squad car's use. It is uncontroverted that what is seen is motion of the squad car and accounting of the officer using the squad car (i.e., Andersen). It is also uncontroverted that at the date and time of Fong Lee's incident, the tape goes blank, to a blue screen, and when the tape begins to show data, all you see is the squad car sitting stationery, parked in front of the City View Elementary School, with its light and siren on.

As set forth above, there is absolutely no depiction of any squad car movement, and absolutely no accounting (audibly or visually) of either Officer Andersen or Trooper Benz. It is also uncontroverted that the police did not secure or impound the squad video for approximately <u>ten</u> days following Fong Lee's death.

It is also uncontroverted that the Minneapolis Police Department had the exclusive possession and control of the videotape. Now, what is produced in discovery seems to be edited (i.e., portions deleted). A reasonable jury can certainly conclude this from the facts and evidence produced. By watching the videotape, there is no other logical conclusion to make.

Under all these facts and circumstances, plaintiff very respectfully asks this court to give an instruction to similar to that in <u>Wajda</u> and consistent with <u>Dillon</u> and consistent with Judge Alsop's opinion in the <u>Backlund</u> case.

Plaintiff respectfully asks the court to give the following instruction:

> Testimony has been introduced indicating that Officer Andersen's
> police car was equipped with a video camera which may have
> shown the initial approach and chase of Fong Lee and the gentlemen
> he was with. The videotape was in the possession and control of
> the City of Minneapolis. The first part of the tape apparently does not
> exist. You are permitted (but not required) to infer from this the
> fact that, the first part of the tape showing the approach and initial

alleged attempted stopping of Fong Lee and his friends is favorable to plaintiff. Weight this along with all other video testimony in this case.

In the present case, the City knew or should have known the squad video would be critical evidence and a lawsuit was imminent.

    4.    <u>Assault and Battery</u>

Plaintiff has also brought claims for assault and battery which were not dismissed by the court. Plaintiff requests standard state law jury instructions on these matters.

    5.    <u>Punitive Damages</u>

Plaintiff seeks punitive damages under State and Federal law. As the court knows, plaintiff's state court claims were amended, with court approval, to include claims of punitive damages. Punitive damages are also allowed and warranted under 42 U.S.C. 1983 against Officer Andersen.

The facts and evidence will show that Officer Andersen acted with deliberate disregard for the rights and safety of the plaintiff. There is more than a sufficient factual basis for a jury to impose punitive damages against Officer Andersen. There is also a factual basis for a jury to infer malice as well.

<u>TRIAL DOCUMENTS</u>

Supplied herewith are plaintiff's motions in limine, witness list, exhibit list, proposed jury instructions and special verdict form.

                                                Respectfully submitted,

THILL LAW FIRM, P.A.

Dated: _____        _____
                                            Richard W. Hechter, Esq. (#193537)
                                            Attorney for Plaintiff
                                            606 Associated Bank Building
                                            5353 Wayzata Boulevard
                                            St. Louis Park, MN 55416
                                            (952) 512-7512